**UNITED STATES of America**

**v.**

**Patt REMBERT, Jr.**

**No. C–CR–88–40.**

. United States District Court,
W.D. North Carolina,
Charlotte Division.

July 12, 1988.
Memorandum of Decision July 15, 1988.

**164**

Thomas Ashcraft, U.S. Atty., Charlotte, N.C., for U.S.

Charles G. Monnett, III, Charlotte, N.C., for Rembert.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on the Government's objections, filed June 30, 1988, pursuant to Section 636(b)(1) of Title 28, United States Code, to the Magistrate's proposed findings of fact, conclusions of law, and recommendation on Defendant's Motion to Suppress. On June 21, 1988, United States Magistrate Paul B. Taylor entered a Memorandum and Recommendation which granted Defendant's Motion to Suppress certain physical evidence. For the reasons contained in a Memorandum of Decision that will be filed following the entry of this Order, this Court will reverse and reject the Magistrate's proposed findings of fact and conclusions of law and will deny Defendant's Motion to Suppress.

NOW, THEREFORE, IT IS ORDERED that Defendant's Motion to Suppress, filed May 23, 1988, is DENIED.

IT IS FURTHER ORDERED that the Magistrate's Memorandum and Recommendation, filed June 21, 1988, is REVERSED and REJECTED.

## MEMORANDUM OF DECISION

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on the Government's objections, filed June 30, 1988, pursuant to Section 636(b)(1) of Title 28, United States Code, to the Magistrate's proposed findings of fact, conclusions of law, and recommendation on Defendant's Motion to Suppress. On June 21, 1988, United States Magistrate Paul B. Taylor entered a Memorandum and Recommendation which granted Defendant's Motion to Suppress certain physical evidence. On July 12, 1988, this Court entered an order reversing and rejecting the Magistrate's proposed findings of fact and conclusions of law and denying Defendant's Motion to Suppress. This Memorandum of Decision contains the findings of fact and conclusions of law supporting the July 12th order.

### II. QUESTIONS PRESENTED

The Government's objections raise four questions. First, did law enforcement agents "seize," within the meaning of the fourth amendment to the United States Constitution, a commercial passenger bus carrying Defendant Rembert when, during a brief rest stop at a bus terminal, two of them went aboard the bus, with the bus driver's permission, for the purpose of questioning the passengers? Second, did the law enforcement agents at any time seize Defendant Rembert when they approached him on the bus, asked him questions, obtained his consent to searches of both his person and of two bags located near him, and proceeded to conduct two pat down searches, which revealed four .38 caliber bullets and two marijuana cigarettes? Third, if Defendant Rembert was seized during either of the above described incidents, did the law enforcement agents have either probable cause to believe, or a reasonable articulable suspicion, that Defendant Rembert was engaged in, or was about to engage in, criminal activity which would justify such seizures? Fourth, if Defendant Rembert was seized in violation of the fourth amendment to the United States Constitution, should the evidence obtained allegedly as a result of the unlawful seizure be suppressed as the "fruit of the poisonous tree"?

## III. SUMMARY OF PROCEEDINGS

On April 5, 1988, a one-count bill of indictment was filed charging Patt Rembert, Jr. ("Rembert" or "Defendant") with a violation of Section 1029(a)(3) of Title 18, United States Code. Specifically, Rembert was charged with knowingly possessing with fraudulent intent eighteen unauthorized access devices, credit cards belonging to others, which possession affected interstate commerce.

On May 23, 1988, Rembert filed a Motion to Suppress, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, seeking suppression of all evidence in this case obtained by law enforcement agents during an allegedly unconstitutional seizure and search of Rembert. On May 24, 1988, Magistrate Taylor entered an order directing the Government to file a response, no later than June 6, 1988, to Defendant's Motion to Suppress.

On June 6, 1988, the Government filed its response to Defendant's Motion to Suppress. On June 8, 1988, Defendant filed a Memorandum of Law in Support of his Motion to Suppress.

On June 8, 1988, Magistrate Taylor conducted an evidentiary hearing on Defendant's Motion to Suppress. United States Attorney Thomas J. Ashcraft appeared on behalf of the Government at the hearing, and attorney Charles G. Monnett, III appeared on behalf of Defendant Rembert. The Government called only one witness to testify: Special Agent Jack Allen Davis of the North Carolina State Bureau of Investigation ("SBI"). Magistrate Taylor heard both Agent Davis' testimony and the arguments of counsel. After the hearing, on June 9, 1988, the Government filed a Supplemental Memorandum of Law.

On June 21, 1988, Magistrate Taylor entered his Memorandum and Recommendation, which granted Defendant's Motion to Suppress. On June 30, 1988, the Government filed, with a supporting memorandum of law, objections to the Magistrate's proposed findings of fact, conclusions of law, and recommendation on Defendant's Motion to Suppress. The Government's objections are now pending before this Court.

## IV. CONTENTIONS OF THE PARTIES

Defendant Rembert asserts that law enforcement agents of the SBI and the Charlotte Police Department violated his constitutional right to be free from unreasonable searches and seizures when they boarded a commercial passenger bus and approached him to ask some questions. Rembert contends that the actions of the agents were unconstitutional because they "seized" him, within the meaning of the fourth amendment, without probable cause or a reasonable articulable suspicion that he was engaged in, or was about to engage in, criminal activity. Rembert concludes by arguing that the purported unconstitutional seizure of his person taints, as "fruit of the poisonous tree," all of the physical evidence gathered from the searches subsequently conducted on his person and on the bags, which yielded, among other things, two marijuana cigarettes, the eighteen credit cards listed in the indictment in this case, four .38 caliber bullets, and a .38 caliber snub-nosed revolver. Rembert urges this Court to issue an order suppressing such allegedly tainted evidence.

The Government strenuously opposes Defendant's motion to suppress. First, the Government characterizes both the initial boarding of the bus and the agents' subsequent conversations with Rembert as purely consensual encounters that do not amount to intrusions implicating the fourth amendment's proscription against unreasonable seizures. Second, the Government emphasizes that during the initial conversations preceding the discovery of the bullets, the revolver, and the marijuana cigarettes Rembert was, in fact, free to refuse to talk to the agents and was free to get off the bus. Third, the Government contends that the circumstances surrounding both the boarding of the bus and the agents' conversations with Rembert were not threatening, intimidating, coercive, or restraining. Although the Government concedes it is possible Rembert subjectively felt confined by the close quarters of the bus, it urges this Court to find that the law enforcement agents did not seize him prior to the con-

sensual search of his person, which yielded four .38 caliber bullets. The Government argues that after conducting the searches the agents had probable cause to arrest Rembert and were able to conduct a search of his person incident to his arrest.

In the June 21st Memorandum and Recommendation, Magistrate Taylor found that the agents seized Rembert at three different times. Magistrate Taylor held that "[t]he first seizure occurred when the police ... approached the bus driver and asked [for] his consent to board the bus and question the passengers." See opinion of Magistrate Taylor herein at page 180 (citing *United States v. Berry*, 670 F.2d 583 (5th Cir.1982)). Magistrate Taylor found that a second seizure "occurred when the two agents ... proceeded down the aisle to the back of the bus where Rembert was sitting, and ... approached Rembert and began to question him." *Id.* at 180. Finally, Magistrate Taylor found that a third seizure "occurred when, during the conversation, Rembert made a quick motion with his right hand and Agent Davis reached over and simultaneously touched Rembert's right pant leg and felt what appeared to him to be a bullet." *Id.* at 180. Magistrate Taylor ruled that these three seizures violated Defendant's fourth amendment rights because the agents did not have a reasonable articulable suspicion or probable cause to believe that Rembert was engaged in, or was about to engage in, criminal activity. *Id.* at 180–82. In addition, Magistrate Taylor ruled that neither the bus driver's consent to board the bus nor Rembert's consent to the searches of his person and of the bags vitiated the tainting effects of the illegal seizures. *Id.* at 182–83. Finally, Magistrate Taylor ruled that Rembert had standing to seek suppression of the evidence seized from the bags because Rembert did not voluntarily abandon them. *Id.* at 183.

The Government objects to the Magistrate's Memorandum and Recommendation on two principal grounds. First, the Government asserts that the Memorandum and Recommendation omits certain crucial portions of the uncontradicted testimony of Special Agent Davis, including testimony to the effect that the agents did not appear to be armed and did not block the bus aisle during their initial conversation with Rembert. Second, the Government contends that the Magistrate's conclusions of law are erroneous. In support of this second point, the Government cites *United States v. Mendenhall*, 446 U.S. 544, 561–562, 100 S.Ct. 1870, 1880–81, 64 L.Ed.2d 497 (1980), and *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and argues that the actions of the agents were reasonable under the circumstances and did not amount to a seizure prior to the discovery of bullets in Rembert's pants pocket. In addition, the Government argues that the search which resulted in the discovery of the bullets was valid either by consent or because at that point there was an articulable reasonable suspicion that Defendant was engaged in criminal activity. Finally, the Government concludes by arguing that all of evidence seized from Rembert's person and from the bags located in the overhead luggage compartment is admissible because the search conducted on Rembert's person after the arrest was a valid search incident to arrest and because he abandoned the bags.

## V. STANDARD OF DECISION

This Court must first determine what standard of decision should be used when ruling on the Government's objections to the Magistrate's proposed findings of fact and conclusions of law. Section 636 of Title 28, United States Code, describes the jurisdiction and powers of United States Magistrates. Subsection (b)(1) of Section 636 states, in pertinent part, the following:

(b)(1) Notwithstanding any provision of law to the contrary—

(A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, *except* a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, *to suppress*

*evidence in a criminal case,* to dismiss or permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

28 U.S.C.A. § 636(b)(1), (b)(1)(A) (West Supp.1988) (emphasis added); *see also In re Appointment of Paul B. Taylor,* Misc. No. 1018–P (W.D.N.C. filed May 11, 1988); *Standing Order of Designation,* Misc. No. 515–P (W.D.N.C. July 28, 1983).

■ Magistrates are only empowered to enter proposed findings and recommendations on dispositive matters, those listed as exceptions in Section 636(b)(1)(A), and such findings and recommendations are non-self-operating. *See United States v. Flaherty,* 668 F.2d 566, 585 (1st Cir.1981) ("[O]nly an Article III court, not a magistrate, may constitutionally enter a final judgment; a magistrate is, therefore, authorized to make only those determinations that do not constitute final judgments."). Non-self-operating magistrate rulings on dispositive matters are not valid until entered by the district court, even when they have not been objected to pursuant to Section 636(b)(1) of Title 28, United States Code. *See Thomas v. Arn,* 474 U.S. 140, 149–151, 106 S.Ct. 466, 472–73, 84 L.Ed.2d 435 (1985). If no objections have been filed on dispositive non-self-operating · magistrate's rulings, the district court judge can give to the rulings, before entering an order adopting them, as much consideration as seems appropriate. *Id.* at 150, 106 S.Ct. at 472.

When there have been objections filed on dispositive non-self-operating magistrate's rulings the district court judge is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b) (West Supp.1988); *see also United States v. Raddatz,* 447 U.S. 667, 673–684, 100 S.Ct. 2406, 2411–17, 65 L.Ed.2d 424 (1980).

After such de novo review, the judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C.A. § 636(b) (West Supp.1988).

In the present case, Magistrate Taylor has ruled on, and granted, Defendant's Motion to Suppress. A motion to suppress is a dispositive pretrial matter. *Id.* § 636(b)(1)(A). Since the Government has objected to the Magistrate's proposed findings of fact, conclusions of law, and recommendation, this Court must now make a de novo determination on Defendant's Motion to Suppress.

■ The Government has requested that this Court conduct a hearing on its objections. The Magistrate's Act does not require a district court to conduct de novo hearings 'on dispositive matters initially ruled upon by a magistrate and objected to by a party. Instead, the statute simply requires a district court judge to make a de novo *determination* on such matters. *United States v. Raddatz,* 447 U.S. at 673–676, 100 S.Ct. at 2411–13. Although the Magistrate's Act authorizes district court judges to "receive further evidence," 28 U.S.C.A. § 636(b)(1) (West Supp.1988), a de novo determination can be made without conducting any additional evidentiary hearing. *United States v. Raddatz,* 447 U.S. at 673–676, 100 S.Ct. at 2411–13; *Proctor v. State Gov't,* 830 F.2d 514, 518 n. 2 (4th Cir.1987) ("the decision to rehear testimony is within the sole discretion of the district judge, even as to those findings based on the magistrate's judgment as to the credibility of the witnesses before him") (citing *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)); *United States v. Veteto,* 701 F.2d 136, 140 (11th Cir.), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1396 (1983). In addition, the United States Supreme Court has held that the due process clause of the fifth amendment to the United States Constitution does not require a de novo hearing to be held in this sort of situation. *United States v. Raddatz,* 447 U.S. at 677–684, 100 S.Ct. at 2413–17.

168

This Court has before it the entire court file in this case, including all of the motions and legal memoranda filed by counsel and a transcript of the evidentiary hearing held before Magistrate Taylor on June 8, 1988. In addition, the undersigned has listened to tapes of the June 8th evidentiary hearing. This Court is of the opinion that there is now no necessity to hold an additional evidentiary hearing on the issues pending before this Court—a sufficiently developed record exists.

## VI. FINDINGS OF FACT

The following facts appear from the credible uncontradicted testimony of Special Agent Davis given at the June 8, 1988 hearing before Magistrate Taylor:

During the last ten years Agent Davis has worked in the SBI's Narcotics Interdiction Unit, and he has received from the Drug Enforcement Administration ("DEA") and Dade County Public Safety extensive specialized training on the subject of drug interdiction. In addition, the Broward County Sheriff's Department, Fort Lauderdale, Florida, has specially trained Agent Davis in bus interdiction techniques. Agent Davis teaches drug interdiction techniques to other law enforcement agents in and around North Carolina.

In the past, Agent Davis has conducted surveillance and interdiction operations at both airports and train stations, but during the past several months he has also conducted narcotics interdiction operations at bus terminals. In the course of his bus terminal surveillance operations, Agent Davis has boarded forty to fifty buses and has made three or four narcotics arrests. The boardings have taken place at irregular intervals, without a predetermined pattern.

On March 23, 1988, Special Agents Jack Allen Davis and Steve Akers of the SBI and Officer Gerald P. Sennett of the Charlotte Police Department had the Greyhound Bus Terminal located in Charlotte, North Carolina, under surveillance as part of the on-going narcotics interdiction program. Other unidentified law enforcement agents also may, or may not, have been involved in the surveillance operation that day. Agent Davis was aware on that day from his training, experience, and intelligence information that drugs often travel from Mexico across the border into and through the south-central portion of the United States toward their destinations, including New York City, New York, a major "terminal" city for imported illegal drugs.

On March 23, 1988, Agent Davis and Officer Sennett were not in uniform. Instead, they wore plain clothes with navy blue nylon windbreakers, often colloquially called "raid jackets," bearing small crests on the front indicating law enforcement affiliation and the word "POLICE" across the back. The agents were armed, but the light-weight nylon jackets concealed their weapons from public view. Agent Akers was also in plain clothes, but he did not have on a "raid jacket."

A bus from the southern United States bound for New York City, New York, arrived at the bus terminal for a rest stop. Agent Davis testified that the standard procedure is to ask the bus driver when he arrives where he has come from and at that time to ask for permission to go aboard the bus when all the passengers have reboarded. Agent Davis further testified that the standard procedure is to make "every effort in the world not to delay the bus at all for the sake of all the other passengers." The bus driver told the agents in response to their inquiries that he had come from Atlanta. That information led Agent Davis to suppose that the bus had traveled through New Orleans from the central Texas area before reaching Atlanta, a "hub" city for the bus line. Agent Davis conceded during his testimony that the passengers on the bus could have transferred at the hub to the bus from any number of locations, including the south Florida area. Agent Davis and Officer Sennett asked for, and received, the bus driver's permission to go aboard the bus for the purpose of talking to the passengers.

After a thirty to forty minute interval, during which time the passengers got off the bus and attended to their various per-

sonal needs and affairs, at approximately 9:50 a.m. the bus driver made an announcement, and all the passengers reboarded the bus. Agent Davis and Officer Sennett then went aboard the bus, walked to the rear, and began questioning passengers by saying, "Excuse me," identifying themselves as law enforcement agents, and asking the passengers if they would talk with the agents. Agent Akers remained outside the bus, but he did not block the bus door or aisle at any time during the other two agents' inquiries on the bus.

The agents intended to question all of the passengers on the bus, starting with those in the rear, and they began with two women seated on the left hand side of the bus, which is the same side as the bus driver's seat. The women were seated across from where Rembert was seated, which was in the last seat on the right hand side of the bus, next to the bus lavatory. The agents and the unidentified women had a conversation that concluded without incident. The agents then turned their attention and inquiries to Rembert.

When the agents boarded the bus they did not have probable cause to believe that Rembert was involved in any criminal activity, and they did not have a articulable reasonable suspicion that he was engaged in criminal conduct. Indeed, Agent Davis testified that the agents were basing their entire bus investigative operation upon articulable suspicions developed during conversations with the people on the bus. The agents did, however, observe and note that Rembert "definitely watched" them move all the way down the aisle to the back of the bus.

The agents initially positioned themselves in the aisle to the rear of Rembert's seat and did not block his access to the aisle. This initial positioning placed the agents in front of the door of the lavatory. Agent Davis identified himself by showing his credentials and asked Rembert if he would consent to talking to Davis and the other agent for minute. Rembert gave an affirmative response. Agent Davis then proceeded to ask Rembert where he was coming from and where he was going.

Rembert said he was from Alabama and was headed to New York City.

After Rembert gave these responses, Agent Davis noticed that Rembert became physically nervous to an unusual degree, with slurred speech, fidgeting, shaking his hands, and shifting from side to side. Agent Davis then asked Rembert if he had any identification or bags, and Rembert said he did not.

These verbal responses and physical reactions aroused Agent Davis' suspicions. Agent Davis realized that the trip from Alabama to New York would be fairly lengthy and that it would be unusual for someone to travel so far for so long without any identification or baggage. Agent Davis said, "Sir, you're not under arrest, you're not in any kind of trouble, we're just asking your cooperation, we're narcotics officers ... looking for narcotics on the bus." Agent Davis then asked Rembert if he would consent to a search of his person and bags. Rembert said yes, but then he quickly moved one of his hands towards his right pants pocket. Alarmed and concerned for his own safety and that of the other officer and passengers, Agent Davis quickly and simultaneously reached across Rembert for the pants pocket, and Rembert very quickly moved his own hand out of the way, without struggling. In the process of reaching for Rembert's pants pocket, Agent Davis shifted his position so that he was physically blocking Rembert's access to the aisle. At this same time Officer Sennett moved around Agent Davis "to cover" him.

Agent Davis probed the outside Rembert's right pants pocket with his fingers and detected something shaped like bullets. Agent Davis then asked Rembert to stand up, and, as he did, Davis retrieved four .38 caliber bullets from Rembert's right pants pocket. Agent Davis then proceeded to conduct a quick "pat-down" search for a weapon, a gun, but no weapons or contraband were found.

A brown paper bag and a white plastic bag were located on an overhead baggage compartment directly above Rembert's seat. No other baggage of any kind was

located immediately above Rembert's seat. Agent Davis asked Rembert if the bags belonged to him; Rembert said, "No." Officer Sennett picked up the bags and asked the other passengers if the bags belonged to any of them. No one responded affirmatively to the inquiry.

Agent Davis then asked Rembert, "Do you mind if we look in these bags?" Rembert indicated that he did not object to the agents' search of the bags. Officer Sennett found an unloaded .38 caliber snubnose revolver inside a man's shoe discovered in the white plastic bag. At this point the agents believed that Rembert had committed a crime. Specifically, they believed he had violated a section of the North Carolina General Statutes that prohibits possession of a concealed weapon, N.C. Gen.Stat. § 14–269 (1986); *see also State v. Gainey*, 273 N.C. 620, 622, 160 S.E.2d 685, 686 (1968) ("To be criminal, the weapon must be concealed, not necessarily on the person of the accused, but in such position as gives him ready access to it."). Agent Davis testified that at this point they would not have allowed Rembert to leave the bus, and that he would have advised Rembert he was under arrest if he had attempted to leave.

Officer Sennett then conducted another, more thorough, "pat-down" search on Rembert, who was still standing. Rembert did not voice any objections or reservations before Officer Sennett began this second "pat-down" search. At the time, the agents deemed this second "pat-down" search to be necessary because the first "pat-down" search was done simply to locate any concealed weapons; they believed, from their experience, that illegal narcotics, with which they were primarily concerned, could have been overlooked during such a cursory preventative search. Officer Sennett found in Rembert's left sock two hand-rolled cigarettes that appeared to the agents, based upon their training and experience, to be marijuana cigarettes. Officer Sennett formally advised Rembert that he was under arrest, handcuffed him, and led him off the bus. The entire incident consumed eight to ten minutes, at most, from the time the agents first approached Rembert to the time of his formal arrest.

The agents never informed Rembert during their encounter that he was free to get off the bus or that he could refuse to talk to them. Agent Davis testified, however, that prior to the search that yielded the bullets Rembert could have left the bus. Rembert also could have returned to the bus because the bus driver was not going to pull out of the station until the agents were done with their questioning of the other passengers. Agent Davis testified that in the past people have left the bus during the agents' questioning.

After the agents formally placed Rembert under arrest, they conducted a further search of both Rembert's person and the bags. In the bags the agents found, among other things, clothing in Rembert's approximate size and identification and credit cards with names other than Rembert's. The agents found in Rembert's wallet identification cards bearing female names and a Mastercard credit card bearing the name Charlotte Griffin. The agents transported Rembert to the Charlotte Law Enforcement Center for processing, and while he was there they discovered that Charlotte Griffin's Mastercard had been stolen.

## VII.  THE APPLICABLE LAW

The fourth amendment to the United States Constitution states the following:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

People in public places, such as airport terminals and the streets, are indisputably entitled to the fourth amendment's protection of personal security. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed. 2d 889 (1967) (citing *Katz v. United States*,

389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), for the proposition that the fourth amendment protects people and not places); *United States v. Mendenhall,* 446 U.S. 544, 550, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1979) (opinion of Stewart, J.). The fourth amendment requires the police to obtain, whenever practicable, advance judicial approval of searches and seizures by obtaining a proper warrant, based upon probable cause, issued by a neutral and detached magistrate. *Terry v. Ohio,* 392 U.S. at 20, 88 S.Ct. at 1879. A warrantless arrest can only be constitutionally valid when both probable cause and exigent circumstances exist. *Id.* (citing *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("hot pursuit")); *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (absent probable cause and exigent circumstances, warrantless arrests in the home are prohibited by fourth amendment); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (warrantless arrest in home for nonjailable traffic offense not justified by exigent circumstances).

The United States Supreme Court has recognized, however, that there are times when it is not practicable for the police to obtain a warrant before engaging in certain kinds of legitimate police activity. *Terry v. Ohio,* 392 U.S. at 20, 88 S.Ct. at 1879. The constitutionality of these types of situations is judged by the fourth amendment's general proscription against unreasonable searches and seizures. *Id.* In *Terry* the Court held that the police may, without probable cause and without a warrant, seize an individual and conduct a protective "pat-down" search for weapons when there exists an articulable reasonable suspicion that the individual is engaged, or will be engaged, or has engaged in criminal activity. *Id.* at 30, 88 S.Ct. at 1884.

The *Terry* Court also recognized that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. [W]hen the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen ... a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879

n. 16; *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (unanimous Court); *United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1979) (opinion of Stewart, J.). *See generally* 3 W. LaFave, *Search and Seizure* § 9.2(h) (2d ed. 1987) (discussing police action not constituting a *Terry* stop).

In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, in an opinion joined in by then Associate Justice Rehnquist, formulated a test, inspired by the above-quoted language from *Terry,* to be used to determine when a person has been "seized" within the meaning of the fourth amendment:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554–555, 100 S.Ct. at 1877 (opinion of Stewart, J.) (citations and footnote omitted).

In *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), a plurality of the Court used Justice Stewart's "not free to leave" test in an airport drug courier case, and in *Immigration and Naturalization Service v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), a majority of the Court adopted Justice Stewart's "not free to leave" test in the context of "factory surveys" conducted

to find illegal aliens. In *Delgado*, the majority concluded

> that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps—such as those taken in [*Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979),] —to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

*INS v. Delgado*, 466 U.S. at 216–217, 104 S.Ct. at 1762–63.

The United States Court of Appeals for the Fourth Circuit has acknowledged, adopted, and applied Justice Stewart's "not free to leave" formulation in determining when a "seizure" has occurred for fourth amendment purposes. *See, e.g., United States v. Whitehead*, 849 F.2d 849, 853 n. 12 (4th Cir.1988) ("At no time prior to the dog sniff did the police officer restrain Whitehead's movement or indicate by word or conduct that he was not free to leave."); *United States v. Alpert*, 816 F.2d 958, 960 (4th Cir.1987) (agent did not "seize" defendant when agent first approached defendant in airport terminal and asked for permission to speak with him); *United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986) (DEA agents approaching defendant at airport did not "seize" him when they politely asked if he would answer a few questions and asked if he would allow agents to search his travel bag). The Fourth Circuit has also recently noted that it is the responsibility of the district courts to engage in "a factual determination in resolving a dispute over the nature of an encounter between police and citizen." *United States*

*v. Porter*, 738 F.2d 622, 625 (4th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984). It is for the district court to determine "[w]hether the encounter is voluntary on the part of the citizen and raises no constitutional concerns; whether a limited 'seizure' has occurred under *Terry v. Ohio*, requiring a reasonable, articulable, suspicion of criminal activity; or whether a traditional arrest, requiring probable cause has occurred." *Id.* (citations omitted). The district court's factual determination on the issue of whether a "seizure" has occurred will not be disturbed on appeal unless it is clearly erroneous. *Id.* (citing *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982)).

Very recently the United States Supreme Court has had occasion to reaffirm, in a criminal context, its adherence to the "not free to leave" test. *Michigan v. Chesternut*, —— U.S. ——, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (unanimous Court) (pedestrian not "seized" when followed for short distance by police car that was not using sirens or flashing lights). The *Chesternut* Court revisited *Terry, Mendenhall*, and *Delgado* and offered the following observations on the proper application of the test:

> The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.
>
> While the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the

Fourth Amendment. This "reasonable person" standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

*Michigan v. Chesternut*, 108 S.Ct. at 1979–80 (citations omitted).

## VIII. ANALYSIS

■ The bus stopped at the terminal for reasons entirely unrelated to any law enforcement motive or influence, and, therefore, the agents could legitimately approach the bus and seek the bus driver's permission to go aboard. This first approach did not constitute a seizure because the bus was already stopped. *See Colorado v. Bannister*, 449 U.S. 1, 4 & n. 3, 101 S.Ct. 42, 43 & n. 3, 66 L.Ed.2d 1 (1980) (police officer's approach to side of car already stopped at service station was "entirely legitimate"); *see also* 3 W. LaFave, *Search and Seizure* § 9.2(h), at 409 & n. 230 (2d ed. 1987) (citing fourteen cases in which courts held that officers did not seize parked cars by merely walking up to cars and asking occupants questions). The agents did not in any way force the bus pull into the bus terminal; they did not erect a roadblock, activate sirens or flashers, command the bus to stop, display weapons, or aggressively attempt to affect the bus's movement, speed, or direction. *Michigan v. Chesternut*, 108 S.Ct. at 1978–80. If the bus had simply slowed down, paused at the terminal, and proceeded on its journey, it is highly unlikely that the agents would have taken any steps to hinder its further progress. Agent Davis specifically and credibly testified that he has not stopped any buses, but has waited until they stop. Thus, a seizure did not occur when the bus first pulled into the bus terminal.

The agents then proceeded to ask the bus driver for his consent to go aboard the bus. There is no evidence in the record indicating that the agents did anything to intimidate the bus driver into giving his consent. After obtaining the bus driver's permission to go aboard the bus for the purpose of questioning the passengers, the agents waited thirty to forty minutes for the passengers to do what bus passengers normally do at a rest stop—utilize restrooms and get refreshments. The agents did not delay the passengers before they began to reboard the bus. At one point the bus driver announced that it was time for the passengers to reboard. The passengers reboarded the bus, and then the agents went aboard, with the bus driver's previously obtained permission, and began to walk to the back of the bus. This simple consensual boarding, without any show of force or intimidation, cannot be reasonably considered to be a seizure of the entire bus and all the passengers.

In *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247, the United States Supreme Court recognized that a seizure of an entire factory's work force did not occur when armed agents of the Immigration and Naturalization Service ("INS"), in search of illegal aliens, entered the factory with the factory owners' permission. *Id.* at 212, 217 n. 5, 104 S.Ct. at 1760, 1763 n. 5 (factory survey was conducted with employer's consent and therefore agents were "lawfully present" inside factory). Although the insides of commercial passenger buses are normally only accessible to bus personnel and paying-ticket holders, the agents received the bus driver's consent to join the passengers on the bus, and, therefore, "the same considerations attending contacts between the police and citizens in public places should apply." *Id.* at 217 n. 5, 104 S.Ct. at 1763 n. 5; *cf. United States v. Whitehead*, 849 F.2d 849, 853 n. 12 (4th Cir.1988) (AMTRAK police did not seize defendant on train when they first entered with consent his roomette).

As the agents went aboard the bus, they did not do anything that would have indicated to the passengers that they were not free to get off the bus. The agents did not make a general announcement of their identity, presence, and purpose when they boarded the bus. Instead, they quietly walked to the back of the bus and began their inquiries in a discreet fashion. As the agents came onto the bus, only the front of

the agents' windbreakers faced the passengers, and, therefore, the passengers would have seen only the small identification crests and would not have been able to view the word "POLICE" on the backs of the jackets until the agents walked past. In short, the agents did nothing to call the passengers' attention to them, and their dress and manner were not calculated to draw the passengers' attention.

Nor did the agents physically block the door of the bus. Agent Akers remained outside while Agent Davis and Officer Sennett conducted their inquiries on the bus, but there was no testimony indicating that he would have prevented anyone from leaving the bus. On the contrary, Agent Davis specifically noted that in the past people have gotten up and walked by the agents, unhindered either inside or outside the bus, in an effort to get off the bus.

Under these circumstances a reasonable person who needed to leave the bus—perhaps to retrieve an important item forgotten in the bus terminal—would have felt free to get off the bus to do whatever needed to be done. The agents by their unobtrusive actions and appearances would not have influenced in the smallest way a passenger who had a good reason to leave the bus. Admittedly, a passenger would probably have to have an important personal reason to leave the bus and thereby risk being left behind, but the agents did not create by their actions or their appearances either physical or psychological barriers blocking the passengers' access to the bus exit.

The only constraint to remain on the bus a reasonable passenger might have felt under these circumstances would have been caused by the knowledge—or more accurately the fear or apprehension—that the bus was preparing to resume its journey. Yet, in the absence of any display or announcement that the passengers could *not* get off the bus, a reasonable passenger who really needed to get off the bus would have approached the bus driver and asked for a minute to do what needed to be done. If the driver refused to wait, the passenger may have been deterred from getting off

the bus, but not forcibly prevented from doing so. If the reason for getting off the bus was compelling enough the passenger would proceed to leave the bus anyway, do the necessary thing, and wait for the next bus, or take another mode of transportation to his ultimate destination. This psychological constraint to remain with the vehicle—commonly felt by all travelers— was not in any way caused by the agents' presence or actions on the bus, and, therefore, no seizure occurred when the agents went aboard the bus.

In *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, the Supreme Court rejected the notion that restrictions on freedom of movement, not caused by law enforcement agents, can constitute a seizure. The Court stated the following, which is particularly instructive in the present case:

> We reject the claim that the entire work forces of the two factories were seized for the duration of the surveys when the INS placed agents near the exist of the factory sites. *Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers.* The record indicates that when these surveys were initiated, the employees were about their ordinary business, operating machinery and performing other job assignments. *While the surveys did cause some disruption,* including the efforts of some workers to hide, *the record also indicates that workers were not prevented by the agents from moving about the factories.*

*Id.* at 218, 104 S.Ct. at 1763 (emphasis added). In the present case, the physical dimensions of the bus did restrict the bus passengers' freedom of movement, but the passengers voluntarily placed themselves on the bus with full knowledge that the interior of a bus is a confining environment. The agents in this case did not enhance in any way the restricting characteristics of the bus interior by their mere presence on the bus.

Agent Davis testified that the bus driver was not going to leave the bus terminal until the agents completed their inquiries aboard the bus. Magistrate Taylor found this to be of special importance:

> Clearly, the police conduct at this point caused fare-paying passengers to be delayed from proceeding on their established journey, and constituted a seizure of their persons and effects. The passengers had no choice in this matter and clearly were not "free to go" or otherwise continue on their established journey until the police had finished their questioning.

See opinion of Magistrate Taylor herein at page 180. It is not clear from the record, however, that, but for the agents boarding the bus, the bus would have actually left the bus terminal at 9:50 a.m. This Court takes judicial notice, Fed.R.Evid. 201, that the Atlanta to New York bus has a scheduled arrival time in Charlotte at 9:30 a.m. and has a scheduled departure time of 10:00 a.m. Agent Davis specifically testified that during bus interdiction operations he makes "every effort in the world not to delay the bus at all for the sake of all the other passengers." It appears to this Court that the 9:50 a.m. boarding time is consistent with the Agent Davis' expressed intention not to delay the bus. At 9:50 a.m. the bus still would be at the bus terminal for another ten minutes, and it was this ten minute interval that the agents used to make their inquiries. Indeed, only eight to ten minutes, at most, elapsed from the time the agents first approached Rembert to the time of his formal arrest. Therefore, it cannot be said that the agents caused the bus to be delayed.

■ When the agents approached Rembert and asked him for permission to speak with him, they did not "seize" him. The agents were entirely non-threatening in their appearance and conduct. They were not in uniform, displayed no weapons, and spoke to Rembert in a low tone of voice. The agents did not block the aisle or otherwise physically prevent Rembert from getting up out of his seat and walking off the bus. A reasonable person in Rembert's position assessing the situation that existed during the initial encounter between the agents and Rembert could not have believed that the agents were compelling him to remain in the seat or to respond to the agents' questioning. In fact, under the circumstances, a reasonable person would have felt free to leave the agents' presence and free to refuse to answer any of their questions. *INS v. Delgado*, 466 U.S. at 216–217, 104 S.Ct. at 1762–63; *United States v. Whitehead*, 849 F.2d 849, 853 n. 12 (passenger in roomette on moving train not detained when approached by AMTRAK police); *United States v. Alpert*, 816 F.2d at 960; *United States v. Lehmann*, 798 F.2d at 694.

During this first encounter Rembert indicated he would talk to the agents, said he was from Alabama and was headed to New York City, and became physically nervous to an unusual degree, with slurred speech, fidgeting, shaking his hands, and shifting from side to side. Agent Davis then asked Rembert if he had any identification or bags, and Rembert said he did not. Agent Davis said, "Sir, you're not under arrest, you're not in any kind of trouble, we're just asking your cooperation, we're narcotics officers ... looking for narcotics on the bus." Agent Davis then asked Rembert if he would consent to a search of his person and bags. Rembert said yes.

Up to this point, the agents did not seize Rembert. Clearly, a reasonable person faced with these same circumstances would have believed he was free to withhold his consent and free to break the conversation off. *United States v. Alpert*, 816 F.2d at 960; *United States v. Lehmann*, 798 F.2d at 694.

■ The agents first "seized" Rembert when he made a quick move for his pocket. At that time, Agent Davis simultaneously reached across Rembert to his right pants pocket and shifted his position in such a way as to block the aisle. Officer Sennett also moved at this time in such a way as to block the aisle. This seizure, however, was fully justified under the standards of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.

2d 889 (1968). There certainly were sufficient articulable reasons to suspect that crime was "afoot." First, Rembert appeared unusually nervous when the agents approached him and questioned him in an entirely non-threatening way. Second, in response to the agents' questions Rembert said he did not have any luggage or identification. Third, he indicated that he was headed to New York City, a known "terminal" city for narcotics. Fourth, after Rembert gave the agents his consent to search his person and bags, he made an unexpected quick move with one of his hands toward his right pants pocket. This action was clearly inconsistent with the consent to search given only moments before, and, therefore, it indicated that Rembert was possibly engaged in, or was about to engage in, some illegal activity. Rembert's quick move coupled with his prior suspicious answers and physical reactions created sufficient reasonable suspicion of a crime to justify a *Terry* stop.

Pursuant to this valid *Terry* stop, Agent Davis discovered four .38 caliber bullets in Rembert's right pants pocket. He then executed a quick "pat-down" search for a weapon—perhaps for a gun to go with the bullets—but he failed to find a weapon. Agent Davis then asked Rembert if he would mind if the agents looked into two bags situated above Rembert's seat in the baggage compartment. Rembert indicated that he did not object to the agents' search of the bags, and Officer Sennett found an unloaded .38 caliber snub-nose revolver inside a man's shoe discovered in one of the bags. This search was conducted pursuant to Rembert's voluntary consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and at this point the agents had probable cause to arrest Rembert for carrying a concealed weapon.

Officer Sennett then conducted, another, more thorough, "pat-down" search on Rembert, and he found in Rembert's left sock two marijuana cigarettes. At this point the agents had probable cause to arrest Defendant for a narcotics · violation, and, therefore, they were fully justified in formally advising Rembert that he was under arrest.

All of the evidence found on defendant's person after his formal arrest is admissible as the fruit of a search made incident to a valid arrest. *Michigan v. De Fillippo*, 443 U.S. 31, 35–36, 99 S.Ct. 2627, 2630–2631, 61 L.Ed.2d 343 (1979); *United States v. Robinson*, 414 U.S. 218, 224–226, 94 S.Ct. 467, 471–473, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 2039–2040, 23 L.Ed.2d 685 (1969). All of the evidence found in the bags is admissible either as the fruit of a consensual search or as abandoned property.

## IX.  CONCLUSIONS

First, law enforcement agents did not "seize," within the meaning of the fourth amendment, a commercial passenger bus carrying Rembert when, during a brief rest stop at a bus terminal, two of them went aboard the bus, with the bus driver's permission, for the purpose of questioning the passengers. Second, the agents did not seize Rembert when they approached him on the bus, asked him questions, and obtained his consent to searches of both his person and of two bags located near him. Third, Defendant Rembert was seized when Agent Davis reached across Rembert's body towards his right pants pocket, but at that time there existed a reasonable articulable suspicion that Rembert was engaged in, or was about to engage in, criminal activity. Fourth, all of the evidence gathered by the agents is admissible since it was collected pursuant to valid searches, and, therefore, Defendant's Motion to Suppress should be denied.

For the reasons explained above in this Memorandum of Decision, this Court entered an Order on July 12, 1988, denying Defendant's Motion to Suppress and reversing and rejecting the Magistrate's Memorandum and Recommendation filed on June 21, 1988.

## MEMORANDUM AND RECOMMENDATION

PAUL B. TAYLOR, United States Magistrate.

THIS MATTER is before the Court upon the defendant's Motion to Suppress tangi-

ble evidence which was obtained as a result of an alleged illegal search and seizure, in violation of the defendant's rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States. On June 8, 1988, the undersigned Magistrate conducted a hearing on this Motion, at which time the only witness to testify was North Carolina State Bureau of Investigation (SBI) Special Agent Jack Allen Davis. Based upon the evidence presented at the hearing, the briefs and arguments of counsel, and pertinent authorities, the Court herewith enters the following findings of fact, conclusions of law, and recommendation.

## I. FINDINGS OF FACT

Jack Allen Davis, a Special Agent with the North Carolina State Bureau of Investigation, has worked for the past ten years in the SBI's Narcotics Interdiction Unit. Agent Davis has had extensive specialized training in drug interdiction and has also had the opportunity to train other agents in drug interdiction.

On March 23, 1988, Agent Davis, along with Special Agent Steve Akers, of the SBI, and Officer Sennett, of the Charlotte Police Vice Division were engaged in a routine surveillance at the Charlotte bus station of buses arriving from known source cities for drugs. At this time, Agent Davis was aware that drugs were coming into the United States across the Mexican border, through the south-central part of the United States, and that New York City was a major terminal city for drugs coming into this country. Agent Davis had been involved with drug interdiction surveillance for many years at various airports and train stations, but had begun surveillance at the bus station only 6 or 7 months prior to this incident. Since beginning the bus program, Agent Davis had boarded 40 to 50 buses to question passengers, and had made 3 or 4 narcotics seizures. There was no regular schedule for surveillance of buses, and the days and buses for surveillance were apparently chosen on a random basis by these officers.

Shortly before 9:50 a.m. on March 23, a bus from Birmingham, Alabama [1] heading for New York City arrived at the Charlotte, North Carolina, bus station for a rest stop. The agents waited thirty to forty minutes from the time the bus came into the station until the passengers were reboarded onto the bus and waiting to leave the station, when they approached the driver, asked where the bus was from and for permission to board the bus to question the passengers. Agent Davis further stated that in accordance with their usual practice in these situations, two of the agents walked first to the rear of the bus to question passengers with the intention of working their way forward to the front of the bus, while a third officer remained outside. Although not in police uniforms, Agent Davis and Officer Sennett were wearing blue nylon "raid jackets" which had a crest on the front that said "State Bureau of Investigation" and the word "Police" across the back. Agent Davis explained this attire by stating that he believed it is not "threatening" within the meaning of the law as would be a police uniform with exposed guns, while at the same time, it lets the public know that they are in fact law enforcement officers.

Patt Rembert,[2] the defendant in this case, was seated in the last seat in this bus on the left-hand side.[3] After speaking with

---

1. Agent Davis' testimony on the bus's origin was equivocal. However, at the time of this incident, he believed this bus had come from a hub in Atlanta, and before that from New Orleans and central Texas. Agent Davis offered no explanation for his suspicions of the bus's origin or route prior to Birmingham, other than his "experience with this particular bus."

2. Agent Davis testified that Rembert watched him and Officer Sennett as they approached the back of the bus, but also conceded that most people in these situations tend to watch the

officers as they board the bus. In light of the circumstances of this situation, the Court finds that Rembert's observation of the officers as they approached his seat in the rear of the bus was an act of typical and justifiable curiosity in which any citizen would likely engage, and could not be used to support any notion of reasonable suspicion that "crime was afoot."

3. Agent Davis drew a schematic diagram of the bus showing where Mr. Rembert was seated, which was introduced at the hearing as Exhibit 1.

two women on the other side of the aisle,[4] Agent Davis and Officer Sennett turned to Rembert. Agent Davis conceded at the hearing that he had no suspicions about Rembert before boarding the bus.[5] With both officers standing in what Davis conceded was a "narrow aisle" beside and to the rear of Mr. Rembert's seat, Agent Davis displayed his credentials and asked Rembert if he minded talking with them, to which Mr. Rembert responded, "O.K." Agent Davis then asked where he was from, to which Mr. Rembert responded, "Alabama." Agent Davis then asked where he was traveling to, and Mr. Rembert responded, "New York City." At this time, Agent Davis noticed that Mr. Rembert was physically nervous, his speech was slurred, he was fidgeting in his seat, and turning from side to side. Agent Davis then asked Mr. Rembert if he had any identification, to which Mr. Rembert responded, "No." Agent Davis then asked if Mr. Rembert had any bags, to which he again responded, "No."

At this point, Agent Davis testified, his suspicions were aroused because of the length of this bus trip and the fact that Mr. Rembert was not carrying any bags or identification. Agent Davis also observed that, at this time, the defendant's hands were shaking. Agent Davis then stated, "Sir, you're not under arrest, you're not in any kind of trouble, we're just asking your cooperation, we're narcotics officers ... looking for narcotics on the bus." (Tr. p. 8). Agent Davis then asked Rembert if he would consent to a search of his person and bags. Rembert responded, "Yes," and made a quick movement with his right arm toward his right pants pocket. Agent Davis simultaneously reached for Defendant's right pocket and felt through the fabric of the pants what appeared to be a bullet. Agent Davis then asked Rembert

to stand up, whereupon Agent Davis reached into Rembert's right pants pocket and pulled out four .38 caliber bullets. Agent Davis further conducted a quick pat-down of the rest of Rembert's body, but found nothing unusual or illegal.

After this pat-down, Agent Davis asked Rembert if the two bags above his seat belonged to him. There was one brown paper bag and one white plastic bag. Rembert said, "No." Officer Sennett then took the bags down off the rack. There were no other bags on the rack over Defendant's seat or in close proximity to these bags. Officer Sennett asked the other passengers on the bus if the bags belonged to anyone, to which he received a response of "No." At this point, Agent Davis again asked the defendant if he minded if they opened the bags, to which Mr. Rembert responded that he did not care. Inside the bag, Agent Davis found a shoe, inside of which was an unloaded gun. At this point, as Agent Davis testified, he believed that a crime had occurred, because it is illegal to carry a concealed weapon in North Carolina. Officer Sennett then performed a second pat-down of Rembert and found two marijuana cigarettes in the sock of his left leg. At this point, Mr. Rembert was placed under arrest. During their questioning of Rembert, the officers never specifically informed him that he did not have to consent to a search or that he was free to get off the bus.

Agent Davis estimated that the time from their first approach to Mr. Rembert to the time of the arrest was 8 to 10 minutes maximum. Subsequent to the arrest, the police found in the brown bag taken from above Mr. Rembert's seat, clothing of the same size as the defendant, along with identification and credit cards belonging to other persons. In Mr. Rem-

---

4. Agent Davis did not testify as to what was said in the conversation with these women, or whether Rembert heard or could have heard what was being said.

5. When asked specifically why he did not get a search warrant during the bus's 30–40 minute rest stop, Davis replied,

We would not have any probable cause at that point normally, sir, unless we've received prior information via telephone to obtain a search warrant. We're basing our entire investigation upon an articulable suspicion that we develop as we talk to the people as opposed to prior information to obtain a warrant. (Tr. p. 27).

bert's wallet, the officers found a Master Card credit card in the name of Charlotte Griffin and other female identification cards.

When asked to state the factors which caused him to be suspicious of Rembert, Agent Davis cited Rembert's observation of the officers as they approached, the physical indications of nervousness exhibited by Rembert upon questioning, the fact that Rembert had no bags or identification considering the length of the trip, and Rembert's quick arm movement towards his pants pocket.

Patt Rembert, Jr. was subsequently charged in a single-count indictment with possessing eighteen unauthorized access devices (credit cards belonging to others) with the intent to defraud, in violation of 18 U.S.C. § 1029(a)(3).[6]

## II. CONCLUSIONS OF LAW

The Fourth Amendment to the Constitution of the United States provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....". "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). The ultimate question in this case is whether, in light of all the surrounding circumstances, Mr. Rembert's "right to personal security was violated by an unreasonable search and seizure." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

### A. The Seizures

In order to decide this question, the Court must first determine whether, and at what point, Mr. Rembert was "seized" by the police within the meaning of the Fourth Amendment. In *Terry v. Ohio*, the Supreme Court held that "whenever a police officer accosts an individual and restrains his *freedom to walk away*, he has 'seized' that person." 392 U.S. at 16, 88 S.Ct. at 1877 (emphasis added). This standard was further developed in *United States v. Mendenhall*, where the Supreme Court held that "a person is 'seized' only when, by means of physical force or show of authority, *his freedom of movement* is restrained." 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Plurality opinion of Stewart, J.) (emphasis added). In discussing this standard, the Court in *Mendenhall* further observed that

As long as the person to whom questions are put *remains free to disregard the questions and walk away*, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

. . . . . .

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (Plurality opinion of Stewart, J.). The "not free to leave" standard was subsequently adopted by the majority of the Court in *I.N.S. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

In *Mendenhall*, police officers approached the defendant in the public concourse of the Detroit Metropolitan airport after she had left an aircraft which had arrived from Los Angeles. The officers asked to speak with Mendenhall and asked for identification and a copy of her ticket. In that situation, the Court held, no seizure had occurred. In particular, the Court noted that "the events took place in the *public* concourse. The agents wore no uniforms and displayed no weapons." 446 U.S. at 555, 100 S.Ct. at 1877. The Court then

---

**6.** At Rembert's federal court detention hearing, the Pretrial Services Office reported that state charges against Rembert for carrying a concealed weapon, credit card theft, and misdemeanor drug possession had been dismissed.

concluded that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and *proceed on her way,* and for that reason, we conclude that the agents' approach to her was not a seizure." 446 U.S. at 555, 100 S.Ct. at 1878 (emphasis added).

Using the standards set forth in *Terry* and *Mendenhall,* the Court finds that there were at least three seizures of Mr. Rembert before he was formally placed under arrest. The first seizure occurred when the police, after waiting 30 to 40 minutes for the passengers to reboard their bus after a rest stop, approached the bus driver and asked his consent to board the bus and question the passengers. Clearly, the police conduct at this point caused fare-paying passengers to be delayed from proceeding on their established journey, and constituted a seizure of their persons and effects. The passengers had no choice in this matter and clearly were not "free to go" or otherwise continue on their established journey until the police had finished their questioning. On this point, the Fifth Circuit has observed that, "blocking an individual's path or otherwise intercepting him *to prevent his progress in any way* is a consideration of great, and probably decisive, significance" in determining whether a seizure has occurred. *United States v. Berry,* 670 F.2d 583 (5th Cir.1982) (emphasis added). Consequently, the Court finds that Mr. Rembert was seized by the police at the moment they boarded the bus.

The second stop occurred when the two agents, dressed in SBI "raid" jackets, proceeded down the aisle to the back of the bus where Rembert was sitting, and, after speaking to two women on the other side of the aisle, approached Rembert and began to question him. Clearly, under these circumstances, a reasonable person would not believe that he was "free to go." Indeed, Rembert had no choice but to remain seated on the bus and be subjected to the officers' scrutiny and questions, at close proximity. He had purchased a ticket and was proceeding on his way to New York City. Certainly, Mr. Rembert could not be expected to get off the bus at an intermediate city on his route at a time when the bus had just ended its rest stop and was about to continue on its way. Clearly, under both the spirit and the letter of the Fourth Amendment and the Supreme Court's holding in *Terry* and *Mendenhall,* Mr. Rembert was not "free to go" and was, thus, seized by the officers at the moment they approached and began to question him in the narrow confines of the back of a bus that was, but for the agents' intrusion, about to proceed on its scheduled journey to New York.

The third stop occurred when, during the conversation, Rembert made a quick motion with his right hand and Agent Davis reached over and simultaneously touched Rembert's right pant leg and felt what appeared to him to be a bullet. At this point, Agent Davis had Rembert stand up and performed a pat-down search of his body and clothing. Mr. Rembert was clearly seized when he was subjected to this physical search. *Terry v. Ohio.*

### B.  *Justification for the Seizures*

Having found that the police officers in this case "seized" Mr. Rembert on at least three occasions prior to his actual arrest, the next inquiry is to determine whether or not the police had a reasonable suspicion that "crime was afoot," *Terry v. Ohio,* 392 U.S. at 30, 88 S.Ct. at 1884, or other lawful justification for the seizures. In making this evaluation, the Court recalls Justice Harlan's concurring opinion to *Terry,* wherein he stated that, prior to a seizure

the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but *to be in his presence.* That right must be more than the liberty (again possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit

to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forced stop to investigate a suspected crime.

392 U.S. at 32–33, 88 S.Ct. at 1885–1886.

The Supreme Court has crystallized this point further by stating in *Reid v. Georgia* that "while the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a *reasonable and articulable suspicion that the person seized is engaged in criminal activity.* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (citations omitted) (emphasis added). *See also, United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (requiring "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity . . . .").

In the present case, Agent Davis stated that he had no prior information with regard to Rembert before he boarded the bus to question the passengers. Additionally, his boarding the bus and questioning the passengers that day was based, not on any suspicion of specific criminal activity, but rather on a random program carried out at Davis' own discretion to look for drug couriers. Indeed, as Davis himself testified, "We're basing our entire investigation upon an articulable suspicion that we develop as we talk to people . . . ." Clearly, the agents in this case did not have "a reasonable and articulable suspicion" that anyone on the bus was "engaged in criminal activity" at the time they interrupted the bus's departure to board it and ask questions of the passengers. Consequently, the first stop was an illegal seizure of the bus and its passengers.

The delay of this interstate bus at an inland city for the purpose of allowing police officers to board the bus and question the passengers is not supported by the line of cases authorizing border stops of passengers and vehicles.[7] At international borders, passengers are aware of customs and immigration procedures and, thus, reasonably can expect to be questioned and searched with regard to their identity, citizenship, and contraband. *See, e.g., United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). On the other hand, the Supreme Court has expressly condemned "roving patrols" and fixed point searches away from the border where probable cause and/or consent are lacking, and where the officers have exercised unbridled discretion to stop and question drivers at random. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *United States v. Ortiz,* 422 U.S. 891, 895–896, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975); *Delaware v. Prouse,* 440 U.S. 648, 662–663, 99 S.Ct. 1391, 1400–1401, 59 L.Ed.2d 660 (1979). As in those cases, the agents in the present case exercised a "degree of discretion . . . not consistent with the Fourth

---

**7.** The stopping of inland buses so that police officers may board and question passengers in a search for drug couriers is apparently a question of first impression in the federal courts. However, the issue is presently pending before the Supreme Court of Florida in *Bostick v. State,* No. 70–996, on appeal from a denial of a motion to suppress entered by the trial court and affirmed, over a vigorous dissent, by the Florida Court of Appeals. 510 So.2d 321 (Fla.App.1987).

In two additional similar cases, the Florida Court of Appeals took divergent paths. In *State v. Carroll,* 510 So.2d 1133 (Fla.App.1987), the Court affirmed without opinion the trial court's suppression of evidence seized from a bus passenger. Judge Glickstein, concurring in the result, filed a written opinion wherein, in regard to the police's random approach of passengers on board buses, he stated, "I find such interference with individual privacy repulsive and I disagree with the suggestion that it is an 'encounter.' To me, it is a 'stop.'" 510 So.2d at 1134.

In *Hunter v. State,* 518 So.2d 304 (Fla.App. 1987), the Florida Court of Appeals affirmed the trial court's denial of the defendant's motion to suppress because there was evidence that the defendant had observed other passengers refuse to consent to any search before he consented to a search. In a concurring opinion, Judge Glickstein again criticized the police practice of boarding buses to question passengers by stating, "We find this inquiry of each passenger more appropriate to totalitarian countries than to our own. Accordingly, we deplore it." 518 So.2d at 306.

Amendment." 422 U.S. at 896, 95 S.Ct. at 2588.

With regard to the second stop, the Court also finds that the police conduct was unlawful because the agents had no reasonable and articulable suspicion that Rembert was engaged in criminal activity at the time they positioned themselves in the narrow aisle near his seat and began to question him.

Finally, the Court finds that the first pat-down search of Rembert was also illegal. At the time the police conducted the first pat-down, the only information they had was that Rembert was traveling from Birmingham, Alabama, to New York City without bags or identification and appeared to be nervous. The Court finds that under the circumstances of this case, those facts did not raise a reasonable suspicion that crime was afoot or that Mr. Rembert was likely engaged in any criminal activity. As Justice Harlan noted in his concurring opinion to *Terry*, 392 U.S. at 32–33, 88 S.Ct. at 1885–1886, *supra*, police officers cannot create reasonable suspicion or fear of bodily harm by thrusting themselves into a situation or place where they are not entitled to be. Since the Court has found that the police in this case were not entitled by any reasonable suspicion to be hovering over Mr. Rembert's bus seat, their fears that he was armed were artificially created and did not support a pat-down search.

## C. The Question of Consent

The next issue presented by this case is whether consent, by Rembert or others on his behalf, vitiated the unreasonable seizures and searches in this case. Agent Davis testified that prior to boarding the bus, he asked the bus driver for permission to board the bus and question the passengers. The effect of the driver's consent was two-fold. The passengers were delayed from proceeding on their journey; and they were subjected to police questioning and scrutiny at close range in the narrow confines of a bus about to leave the station.

The law is clear that the driver's "consent" in this case cannot fairly be imputed to the passengers so as to authorize the police actions taken in this case. In *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Supreme Court held that a hotel night clerk could *not* validly consent to a police request to search a guest's room. On this point, the Court stated,

> Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of "apparent authority."

> .    .    .    .    .

> It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right, therefore which only the petitioner could waive by word or deed, either directly or through an agent.

376 U.S. at 488–489, 84 S.Ct. at 892–893. As in *Stoner*, there is no indication in the record that Rembert, or any of the passengers, authorized the bus driver to consent to a delay of the bus's departure, or to the agents' boarding of the bus and questioning of the passengers. Further, there being no other lawful right for the bus driver to subject the passengers to this type of police intrusion, his consent does not vitiate the unlawful stops here in question.

The next point to consider is whether Mr. Rembert himself consented to the interrogation by the police officers, and in effect, voluntarily gave them the information which they used to arrest him. Although it is true that Rembert agreed to speak with the police officers, in the circumstances of this case, the Court finds that the appearance of the two officers, in SBI "raid" jackets, boarding the bus and coming directly to the back where Mr. Rembert was seated, at a time when the bus was about to leave the station, constituted an intimidating and coercive atmosphere. On this point, the Supreme Court has held that "whether a consent to search was, in fact, 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality

of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–2048, 36 L.Ed.2d 854 (1973). By this standard, and in the totality of the circumstances of this case, the Court finds that any consent which Mr. Rembert gave to the officers to question him or search him or his bags was made under intimidating circumstances and was coerced.

### D. The Question of Abandonment

As an alternative argument, the government claims that Rembert has no standing to assert a violation of his Constitutional rights because he abandoned the bags above his seat, citing *United States v. Washington,* 677 F.2d 394, 396 (4th Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 120, 74 L.Ed.2d 105 (1982); *United States v. Pirolli,* 673 F.2d 1200, 1204 (11th Cir.), *cert. denied,* 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982).

The Court finds the cases cited by the government to be not controlling here. In both cases, bags containing incriminating evidence were abandoned in the absence of police misconduct. Indeed, as the Court stated in *Pirolli,*

> Courts have, of course, found that abandonment may not be voluntary if it is merely the product of police misconduct. *See United States v. Lara,* 638 F.2d 892, 895 (5th Cir.1981). Appellant contends that the abandonment by Pirolli was caused by the illegal conduct of the agents .... This does not, however, fit within the facts .... Nothing they had done thus far was illegal.

673 F.2d at 1204. On the contrary, in the present case, Rembert's abandonment of his bags cannot fairly be said to have been "voluntary" or in the absence of police misconduct. But for the agents' illegal boarding of the bus, questioning of Mr. Rembert, and patting him down, they would not have been in a position to observe the bags over Rembert's seat or develop any interest in searching them. Accordingly, the Court finds that Rembert's "abandonment" of the bags above his seat was not voluntary, and was the product of the unlawful seizures in this case.

### E. Conclusion

In the present case, it is undisputed that, without probable cause or even reasonable suspicion, police officers stopped and boarded a bus, chosen at random in the officers' unbridled discretion, for the purpose of questioning passengers in a search for drug couriers. Regardless of the good intentions of these officers to search out and bring to justice drug traffickers, this scenario clearly violates the reasonableness provision of the Fourth Amendment to the Constitution. As the Supreme Court noted in *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979),

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.

> .    .    .    .    .

> When ... a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

As in *Brown,* the police conduct in this case exceeded the tolerable limits imposed by the Fourth Amendment. As a result, any information the police obtained from boarding the bus, speaking with Mr. Rembert, or while searching his person or bags, was illegally obtained. Additionally, the Court finds that Rembert's "illegal seizure tainted all that ensued in the investigative encounter, and that his consent to the initial search, even if voluntary, did not vitiate the taint. The connection, in temporal and causal terms, between the illegal seizure and the consent—all occurring within the same brief, continuous encounter—was not sufficiently attenuated to remove the former's taint from the ultimate fruits of the search." *United States v. Gooding,* 695 F.2d 78, 84 (4th Cir.1982) *citing Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Accordingly, all evidence obtained from Mr. Rembert after the agents boarded the bus, whether oral statements or tangible objects, must be suppressed.

### III. Recommendation

Based upon the foregoing proposed findings of fact and conclusions of law, I recommend that Defendant's Motion to Suppress be granted.

Counsel are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Failure to file objections to this Memorandum with the district court will preclude counsel from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

Respectfully submitted this 21st day of June, 1988.